No. 32,322

F. H. Hughes, *Appellee*, v. The Marathon Oil Company, *Appellant*.

(50 P. 2d 937)

Opinion filed November 9, 1935.

*Robert S. Lemon, Lawrence M. Walker*, both of Pittsburg, *H. G. Ross* and *Charles R. Holland*, both of Tulsa, Okla., for the appellant.

No appearance was made for the appellee.

The opinion of the court was delivered by

Burch, C. J.: The action was one for damages for injury to real

estate, resulting from erection and operation of a station for storage, in bulk, of gasoline, oil and other petroleum products. The verdict and judgment were for plaintiff in the sum of $400. Defendant appeals.

In the city of Pittsburg is a block numbered 25 on the original plat. It is bounded on the east by Joplin avenue, on the north by Fourth street, on the west by Elm street, and on the south by Third street. The north portion of the block is occupied by two principal switch tracks of the St. Louis and San Francisco Railway Company, extending east and west. In the northwest portion of the block are switch connections between the two principal tracks, and a switch track branches to the south from the south principal track.

The Marathon Oil Company leased from the railroad company a part of lot 23, and lots 24 and 25 in block 25, and in July, 1931, erected on the leased lots the bulk-storage station which has been referred to, consisting of a warehouse, a pump house, and three large storage tanks, all inclosed in a high wire fence. The storage station abuts on the east on Joplin avenue, and on the north on the south switch track.

F. H. Hughes owns lot 26 of block 25, which adjoins the Marathon leasehold and fronts on Joplin avenue. Many years ago he built a one-story, three-room, frame house on the lot, which he subsequently enlarged until it contains six rooms and a pantry. It is called a seven-room house, and has a porch. North of the seven-room house, and fronting on Joplin avenue, is a two-room house. West of this is another two-room house. These houses were built long before the storage station was erected. The two-room house on the front of the lot is thirty-five feet from the storage station warehouse.

Plaintiff's houses were designed for dwellings, but all of them, as well as the storage station, are in an industrial district created by a zoning ordinance of the city in 1926. There are numerous industrial buildings and structures in the neighborhood, including an electric company's transformer station, the bulk-storage station of the Standard Oil Company, an automobile wrecking station and junk yard, the structures of an elevator company, of a milling company, of a wholesale poultry company, and of other industries. A witness for plaintiff testified the district is not a residence district and is a bad district. Joplin avenue in front of plaintiff's houses is not paved. There is no sidewalk in front of plaintiff's houses. No one of them is modern.

The petition alleged that gasoline fumes escaped from defendant's station and tainted and corrupted the atmosphere with noxious and offensive smells until his dwelling houses were unhealthy and unfit for occupation, and it was impossible for plaintiff to secure desirable tenants.

Plaintiff testified he visited his houses frequently. He said:

"You can smell them [fumes] very plainly at times.

"If I paid any attention to it, you could smell the odor of gasoline.

"Every time I was over there, I thought I smelled gasoline."

He said he did not know whether he could smell gasoline when the wind was in the south.

Plaintiff did not call any present or former tenant as a witness to show how he suffered from gasoline fumes. Defendant produced two. One, together with his wife, had lived in the two-room house nearest to defendant's storage station for about two years and had never noticed any fumes. They had not kept him awake, nor made him sick, and he had never noticed any fumes at all. The other tenant occupied the seven-room house with her son, who was fourteen years old. She had never been bothered with noxious or disagreeable fumes from defendant's storage station. She could smell fumes when they were filling trucks, but she could not tell whether they came from the Marathon plant or the Standard Oil plant. She had lived in the house ever since the bulk station was built, except for one month. After being away for one month, she returned voluntarily.

The petition alleged that because of proximity to defendant's storage station, plaintiff could not keep his houses insured against fire. The proof was that the rate on the little house next to defendant's plant had been raised twenty-four cents per $100.

Plaintiff testified to reductions in rent which he said he had been obliged to make after the storage station was built. Except by utterly unparticularized and indefinite statements, he did not connect reduction of rent with presence and operation of defendant's plant.

The jury returned answers to special questions. The second, third and fourth findings read:

"2. What rental did the plaintiff receive from the two-room house on the front of plaintiff's lot immediately before the erection of the bulk plant? A. $6.

"3. What rental did the plaintiff receive from the two-room house on the front of his lot immediately after the erection of the bulk plant? A. $3.50.

"4. What rental does the plaintiff now receive from the two-room house on the front of his lot? A. $2.50."

There was no testimony that immediately before the storage station was erected, plaintiff rented this house for $6 per month. Plaintiff testified that a man lived in the house for several years who paid $8 per month. The man died before the storage station was built. At the time the storage station was built the house was empty quite a bit. He thought that at the time the storage station was built a woman with two children was living there—he could not remember—and she did not stay long. He made no statement with respect to what rent she paid, or who succeeded her, or what rent her successor paid.

The jury returned the following special findings:

"5. What rental did the plaintiff receive from the seven-room house on the front of his lot immediately before the erection of the bulk-storage plant? A. $12.

"6. What rental did the plaintiff receive from the seven-room house on the front of his lot immediately after the erection of the bulk-storage plant? A. $8.

"7. What rental does the plaintiff now receive from the seven-room house on the front of his lot? A. $8."

Plaintiff testified that in normal times he used to get $12 or $15 per month for this house and was getting $12 "just prior to the time the station was built." Josephine Mack was occupying this house at the time of the trial. Plaintiff testified she paid $8 per month when she moved into the house. She testified she moved into the house before the storage station was built, and paid $8 per month when she moved in. She had occupied the house continuously from the time she first moved in, except for one month. Plaintiff did not, on rebuttal, dispute this testimony.

Special findings 8, 9 and 10 read as follows:

"8. What rental did the plaintiff receive from the house on the back of his lot immediately before the erection of the bulk-storage plant? A. $5.

"9. What rental did the plaintiff receive from the house on the back of his lot immediately after the erection of the bulk-storage plant? A. $2.50.

"10. What rental does the plaintiff now receive from the house on the back of his lot? A. $2.50."

There was no testimony plaintiff received $5 per month for this house immediately before the storage station was built. Plaintiff

testified he used to get $5 or $6, would take $5 if he could not get $6, and he did not remember whether anyone was living in the house when the storage station was built. Before the station was built, a man lived in the house for about two years, but paid no rent. He was supposed to pay $5 per month. He did not pay, and he was allowed to live there because the other houses were vacant.

Plaintiff qualified as an expert witness respecting value of real estate in Pittsburg. He said that just before the storage station was built his lot was worth $2,500, and after the station was built the value was $1,000. An expert witness for plaintiff testified that in the latter part of 1930 or early part of 1931 the lot was worth $1,500. Construction of the Marathon Oil Company plant decreased the value as residence property twenty-five percent or fifty percent, or from $1,500 to $750, perhaps $1,000.

The foregoing is presented as a background for the single question of law which the court proposes to notice. It shows the verdict and judgment rest on a cause of action sought to be established which accrued immediately following erection of the storage station.

The station was completed in July, 1931, and anybody could see it was a permanent structure. It was lawfully located in the appropriate zone, pursuant to certificate of the city clerk duly issued. Plaintiff produced no evidence that the station was defectively constructed, and the only evidence on the subject was that it was constructed according to the latest and most advanced methods.

The petition was filed March 21, 1934. The nature of the action was not clear from the allegations of the petition. Defendant filed a general denial, and pleaded certain facts, including proper location and great care in operation of the station. At the trial the attorney for plaintiff disclaimed there was any negligence or want of care in operation of the station. This was the first certain indication of the precise theory of the action, and at the close of plaintiff's evidence defendant interposed a general demurrer.

Application of the two-year statute of limitations is obvious. The latest expression of the court on the subject is the opinion in the case of *McMullen v. Jennings*, 141 Kan. 420 (March 9, 1935), 41 P. 2d 753, in which authorities are reviewed. The demurrer should have been sustained.

The judgment of the district court is reversed, and the cause is remanded with direction to set aside its judgment, and to sustain defendant's demurrer to plaintiff's evidence.